## UNITED STATES DISTRICT COURT

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **[UNDER SEAL],** | Civil Action No. |
| **Plaintiff,** | |
| **v.** | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| **[UNDER SEAL],** | **Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)** |
| **Defendants.** | |

## FILED UNDER SEAL

## NOT TO BE FILED ON PACER

UNITED STATES OF AMERICA, STATE OF
CALIFORNIA, STATE OF COLORADO,
STATE OF CONNECTICUT, STATE OF
DELAWARE, DISTRICT OF COLUMBIA,
STATE OF FLORIDA, STATE OF GEORGIA,
STATE OF HAWAII, STATE OF ILLINOIS,
STATE OF INDIANA, STATE OF
LOUISIANA, STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS,
STATE OF MICHIGAN, STATE OF
MINNESOTA, STATE OF MONTANA,
STATE OF NEVADA, STATE OF NEW
JERSEY, STATE OF NEW MEXICO, STATE
OF NEW YORK, CITY OF NEW YORK,
STATE OF NORTH CAROLINA, STATE OF
OKLAHOMA, STATE OF RHODE ISLAND,
STATE OF TENNESSEE,
STATE OF TEXAS, COMMONWEALTH OF
VIRGINIA, and STATE OF WISCONSIN
 *ex rel.* SMSPF, LLC, AND PANZEY BELGIUM
HARRIS,

       Plaintiffs,

v.

EMD SERONO, INC., PFIZER, INC.,
QUINTILES IMS HOLDINGS, INC., successor
by merger to TRANSATIONAL HOLDINGS,
INC., and RXC ACQUISITION COMPANY
d/b/a RXCROSSROADS,

       Defendants.

The United States of America, ex rel. SMSPF, LLC, and Panzey Belgium Harris, allege the following:

## PRELIMINARY STATEMENT

1.      This is a civil action brought by the United States of America, ex rel. SMSPF, LLC, and Panzey Belgium Harris, ("Plaintiffs") against EMD Serono, Inc. ("Serono") and Pfizer Inc. ("Pfizer," and together with Serono, the "Drug Companies"), and Quintiles Transnational Holdings, Inc. ("Quintiles") and RXC Acquisition Company d/b/a RxCrossroads ("RXC," and together with Quintiles, the "Consultants") under the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), and common law to recover treble damages sustained by, and civil penalties and restitution owed to, the United States Government as a result of three intertwined, unlawful drug marketing schemes by the Drug Companies and the Consultants (collectively, the "Defendants"). First, from 2006 to the present, the Drug Companies have paid tens of millions of dollars to the Consultants to unlawfully provide reimbursement support services to prescribers in exchange for a recommendation of the Drug Companies' drug used to treat multiple sclerosis ("MS").  Next, from 2006 to the present, the Drug Companies have paid millions of dollars to the Consultants for those Consultants to employ clinicians (i.e., Nurse Educators) to recommend the Drug Companies' MS drugs to both providers and patients under the guise of education and counseling—a variation on a scheme the Office of the Investigator General (the "OIG") refers to with repudiation as "white coat marketing."  Last, the Drug Companies and Consultants' clinicians have provided remuneration in the form of free services to prescribing providers since 2006 in order to induce those providers to recommend the Drug Companies' drugs to patients—a more typical unlawful "quid pro quo" kickback scheme.

2.      As will be detailed herein, Defendants' conspiracy completely undermined the

decision making of providers, an important element in Federal healthcare program coverage policy. The providers prescribing the Drug Companies' drugs did not do so because they believed, based on their review of peer-reviewed medical literature or discussion with their colleagues, that the drugs would be the most efficient means of helping their patients. Rather, the Drug Companies' drugs were and are often prescribed to patients because Defendants actively and improperly pursued and enticed providers with kickbacks that would increase providers' profits and reduce administrative burdens for prescribing MS drugs.

3.     As a result of these schemes, pharmacies have and continue to submit claims to Medicare and Medicaid that were tainted by kickbacks, causing these programs to pay millions of dollars in improper reimbursements.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the claims Relators bring on behalf of the United States under the FCA pursuant to 28 U.S.C. §§ 1331 and 1345.

5.     This Court may exercise personal jurisdiction over Serono, Pfizer, Quintiles and RXC, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a) as well as 28 U.S.C. §§ 1391(b) and (c) because the Defendants each transacted and continue to transact business in this District and, in furtherance of its fraudulent kickback schemes, caused to be submitted or conspired to submit false claims in this District.

## PARTIES

6.     Relator, SMSPF, LLC, is a Delaware limited liability company.

7.     Relator, Panzey Belgium Harris, is an individual who resides at 871 Gramercy Hills Lane, Mableton, Georgia 30126, who worked for Pfizer, Inc. as a therapeutic account

specialist from January 2015 to March 2016.  Mr. Harris has personal knowledge of many of the facts set forth in this First Amended Complaint.

8.      Defendant EMD Serono, Inc. is a Delaware corporation, headquartered in Rockland, Massachusetts.  A subsidiary of Merck KGaA, Serono manufactures interferon beta-1a, a drug for treating MS and marketed and sold in the United States as "Rebif."

9.      Defendant Pfizer, Inc., is a Delaware corporation, headquartered in Gladstone, New Jersey.

10.     In a $200 million dollar deal, Pfizer agreed with Serono to co-promote and sell Rebif in the United States in exchange for a portion of all United States sales of Rebif.

11.     Defendant Quintiles IMS Holdings, Inc. (successor by merger to Quintiles Transnational Holdings, Inc.) is a Delaware corporation, headquartered in Durham, North Carolina.   It is the world's largest provider of biopharmaceutical development services and business services, including, conducting services in over 100 countries and generating over $3.7 billion in revenue in 2012.

12.     Defendant RXC Acquisition Company d/b/a RxCrossroads is a Delaware corporation with headquarters in Louisville, Kentucky.  Like Quintiles, RXC is a commercial outsourcing company that, according to their website, provides services for pharmaceutical companies to "positively impact[] access and commercial success of their products."  RXC is a subsidiary of CVS Health.

## STATUTORY BACKGROUND

### A.    The False Claims Act

13.     The United States may recover treble damages pursuant to the TFCA from any individual or entity that:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(C)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

[31 U.S.C. § 3729(a)(1)(A)-(C).]

Within the meaning of the FCA, "knowing" is defined to include reckless disregard and deliberate indifference. *Id*.

14.     In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim ranging from $5,500 to $11,000.  31 U.S.C. § 3729(1)(G); 64 F.R. 47099, 47104 (1999).

**B.     The Anti-Kickback Statute**

15.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("<u>AKS</u>"), states as follows in relevant part:

(b) Illegal remunerations

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration

(including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

    (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

16.    For purposes of the AKS, "remuneration" includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. The statute has been interpreted to cover any arrangement where *only* one purpose of the remuneration is to obtain money for referral of services or to induce further referrals.

17.    The AKS is designed to, among other things, ensure that patient care will not be improperly influenced by inappropriate compensation from the pharmaceutical industry.

18.    In order to ensure compliance, every Federally-funded health care program requires every provider or supplier, as a condition of reimbursement, to ensure, and in some cases certify compliance with the provisions of the AKS and other federal laws governing the provision of health care services in the United States.

19.    The AKS was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the Anti-Kickback Statute are also a violation of the FCA. 42 U.S.C. § 1320a-7(b)(g). The PPACA also amended the AKS "intent requirement" to make clear that violations of the AKS, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or

"specific intent to commit a violation." *Id.* at § 1320a-7(b)(h).

20.    Knowingly providing kickbacks to providers to induce them to prescribe a drug (or to influence provider prescriptions) for individuals who seek reimbursement for the drug from a Federal healthcare program or causing others to do so, while certifying compliance with the AKS (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates the FCA.

21.    The Balanced Budget Act of 1997 amended the AKS to include administrative civil penalties of $50,000 for each violation, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited or received, without regard to whether a portion of that amount was offered, paid or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

22.    The AKS contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors protect Defendants from liability for the conduct alleged herein.

**AFFECTED HEALTH PROGRAMS**

23.    Generally, when a physician prescribes a drug, a patient is provided with a prescription that is then filled at a pharmacy. The pharmacy then submits the claim for payment to the relevant Federal health care program(s) for reimbursement.

24.    In certain circumstances, a Federal program may also have pharmacy facilities that directly dispense prescription drugs. In such cases, the Federal health care program purchases the drug directly rather than reimbursing the pharmacy.

**A.    Medicare**

25.     Medicare is a Federal program that provides federally subsidized health insurance primarily for persons who are 65 or older or disabled. *See* 42 U.S.C. §§ 1395-1395b-10 ("Medicare").  Part D of Medicare was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare beneficiaries, and became effective January 1, 2006.  All persons enrolled in Medicare Part A and\or Medicare Part B are eligible to enroll in a prescription drug plan under Part D.

26.     The United States Department of Health and Human Services ("HHS"), through its component agency, the Centers for Medicare and Medicaid Services ("CMS"), contracts with private companies ("Part D sponsors") to administer prescription drug plans. Such companies are regulated and subsidized by CMS pursuant to one-year, annually-renewable contracts. Part D sponsors enter into subcontracts with pharmacies to provide drugs to the Medicare Part D beneficiaries enrolled in their plans.

27.     Generally, after a physician writes a prescription for a patient who is a Medicare beneficiary, that patient can take the prescription to a pharmacy to be filled. When the pharmacy dispenses drugs to the Medicare beneficiary, the pharmacy submits a claim electronically to the beneficiary's Part D sponsor (sometimes through the sponsor's pharmacy benefit manager, or "PBM"). The pharmacy receives reimbursement from the sponsor (or PBM) for the portion of the drug cost not paid by the beneficiary. The Part D sponsor is then required to submit to CMS an electronic notification of the drug dispensing event, called the Prescription Drug Event ("PDE"), which contains data regarding the prescription claim, including the service provider of the drug, the prescriber of the drug, the quantity dispensed, the amount it has paid to the pharmacy, and whether the drug is covered under the Medicare Part D benefit.

28.     Payments to a Part D Plan sponsor are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program and make payments for qualified drug coverage. 42 C.F.R. § 423.322.

29.     PDE records are an integral part of the process that enables CMS to administer the Part D benefit. Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D program.

30.     CMS gives each Part D sponsor advance monthly payments consisting of the Part D sponsor plan's direct subsidy per enrollee (which is based on a standardized bid made by the Part D sponsor), estimated reinsurance subsidies for catastrophic coverage, and estimated low income subsidies. 42 C.F.R. §§ 423.315, 423.329.

31.     At the end of the payment year, CMS reconciles the advance payments paid to each Part D sponsor with the actual costs the sponsor has incurred. In this reconciliation process, CMS uses the PDE claims data it has received from the Part D sponsor during the prior payment year to calculate the costs the Part D sponsor has actually incurred for prescriptions filled by Medicare beneficiaries under Part D. If CMS underpaid the sponsor for low-income subsidies or reinsurance costs, it will make up the difference. If CMS overpaid the sponsor for low-income subsidies or reinsurance costs, it will recoup the overpayment from the sponsor. After CMS reconciles a plan's low-income subsidy and reinsurance costs, it then determines risk-sharing amounts owed by the plan to CMS or by CMS to the plan related to the plan's direct subsidy bid. Risk-sharing amounts involve calculations based on whether and to what degree a plan's allowable costs exceeded or fell below a target amount for the plan by certain threshold

percentages. 42 C.P.R.§ 423.336.

32.    CMS's payments to the Part D sponsor come from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund. 42 C.P.R.§ 423.315(a).

33.    In order to receive Part D funds from CMS, Part D Plan sponsors, as well as their authorized agents, employees, and contractors (including pharmacies), are required to comply with all applicable federal laws, regulations, and CMS instructions.

34.    By statute, all contracts between a Part D Plan sponsor and HHS must include a provision whereby the Plan sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.

35.    Medicare Part D Plan sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the FCA and AKS. 42 C.F.R.§ 423.505(h)(l).

36.    In accordance with these express statutory and regulatory requirements, all contracts entered into between CMS and Plan D Plan sponsors from 2006 through the present include a provision in which the sponsor "agrees to comply with . . . federal laws and regulations designed to prevent . . . fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. §§ 3729, et seq.), and the anti-kickback statute (§ 1127B(b) of the Act)."  42 C.F.R. § 423.505(h)(1).

37.    CMS regulations further require that all subcontracts between Part D Plan sponsors and downstream entities (such as pharmacies and PBMs) contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42

C.F.R. § 423.505(i)(4)(iv).

38.    A Part D Plan sponsor also is required by Federal regulation to certify to the accuracy, completeness and truthfulness of the PDE claims data submitted to CMS. Specifically, the relevant regulatory provision, entitled "Certification of data that determine payment," provides in relevant part:

> (1) General rule. As a condition for receiving a monthly payment . . . , the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.

> (2) Certification of enrollment and payment information. The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement.

> (3) Certification of claims data. The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under§ 423.329(b)(3) (or for fallback entities, under§ 423.87l(f)) are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.

> [42 C.F.R. § 423.505(k).]

39.    Compliance with the regulatory requirement that the PDE data submitted to CMS is "true, accurate, and complete" is a condition of payment under the Medicare Part D program.

40.    In accordance with this regulatory requirement, since the Part D program began, Medicare required each Part D Plan sponsor to sign annually an Attestation of Data Relating to CMS Payment to a Medicare Part D Sponsor ("Attestation"). This Attestation states:

Pursuant to the contract(s) between [CMS] and the Medicare Part D Organization(s) listed above, hereafter referred to as the Part D Organization, governing the operation of the contract numbers listed above, the Part D Organization hereby makes the following attestations concerning CMS payments to the Part D Organization:

The Part D Organization attests that based on its best knowledge, information, and belief, the final Prescription Drug Event (PDE) data that have been submitted to and accepted by CMS as of [date] with respect to the Part D plans offered under the above-stated contract(s) for the dates of service of January 1, [prior year] to December 31, [prior year], are accurate, complete, and truthful and reflect all retroactive adjustments of which the Part D organization has been informed by May 30, [current year]. In addition, the Part D Organization attests that based on best knowledge, information, and belief, the payments that have been made by the Part D organization for the claims summarized by the aforementioned PDE data were made in accordance with the coordination of benefits guidance in Chapter 14 of the Medicare Prescription Drug Benefit Manual and other applicable CMS guidance. The Part D Organization attests that based on its best knowledge, information, and belief as of the date(s) of last successful DIR [Direct and Indirect Remuneration Data] [prior year] data submission(s) via the Health Plan Management System (HPMS) as listed above, the final direct and indirect remuneration data submitted to CMS for the Part D plans offered under the above-stated contract(s) for the [prior] coverage year are accurate, complete, and truthful and fully conform to the requirements in the Medicare Part D program regulations and the Final Medicare Part D DIR Reporting Requirements for [the prior year]. The Part D Organization also certifies that based on its best knowledge, information, and belief as of the date indicated below, all other required information provided to CMS to support the determination of allowable reinsurance and risk corridor costs for the Part D plans offered under the above-stated contract(s) is accurate, complete, and truthful. With regards to the information described in the above paragraphs, the Part D Organization attests that it has required all entities, contractors, or subcontractors, which have generated or submitted said information (PDE and DIR data) on the Part D Organization's behalf, to certify that this information is accurate, complete, and truthful based on its best knowledge, information, and belief. In addition, the Part D Organization attests that it will maintain records and documentation supporting said information. The Part D Organization acknowledges that the information described in the above paragraphs will be used for the purposes of obtaining federal reimbursement and that misrepresentations or omissions in information provided to CMS may result in Federal civil action and/or criminal prosecution.

41.    All approved Part D Plan sponsors who received payment under Medicare Part D in benefit years 2006 through the present date submitted these required Attestations in the same or similar format.

42.    Medicare regulations further provide: "If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

43.    Medicare also enters into agreements with physicians to establish the physician's eligibility to participate in the Medicare program. For the physician to be eligible for participation in the Medicare program, physicians must certify that they agree to comply with the AKS, among other Federal health care laws.

44.    Specifically, on the Medicare enrollment form, CMS Form 855I, the "Certification Statement" that the medical provider signs states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program. In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below." Those requirements include:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . The Medicare laws, regulations and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity

### B.    Medicaid

45.    Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. Each state administers a State Medicaid program. The Federal Medicaid statute requires each participating state to implement a

plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

46.    While drug coverage is an optional benefit, the Medicaid programs of all states provide reimbursement for prescription drugs.

47.    The Federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

48.    Federal funding under Medicaid is provided only when there is a corresponding state expenditure for a covered Medicaid service to a Medicaid recipient. The Federal government pays to the state the statutorily established share of the "total amount expended ... as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(l).

49.    The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs.

50.    Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R.§ 430.30.

51.     Claims arising from illegal kickbacks are not authorized to be paid under state regulatory regimes. In fact, providers who participate in the Medicaid program must sign enrollment agreements with their states that certify compliance with the state and Federal Medicaid requirements, including the AKS. Although there are variations among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all state and Federal laws and Medicaid regulations in billing the state Medicaid program for services or supplies furnished.

52.     Furthermore, in many states, Medicaid providers, including both physicians and pharmacies, must affirmatively certify compliance with applicable Federal and state laws and regulations.

53.     For example, in New York, physicians and pharmacies must periodically sign a "Certification Statement for Provider Billing Medicaid," in which the provider certifies that claims submitted "to the State's Medicaid fiscal agent, for services or supplies furnished, . . . will be subject to the following certification . . . I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations."

### C.    TRICARE

54.     TRICARE, (formerly known as CHAMPUS), is part of the United States military's health care system, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel, and military retirees and their\dependents.

55.     The military health system, which is administered by the Department of Defense

("DOD"), is composed of the direct care system, consisting of military hospitals and military clinics, and the benefit program, known as TRICARE. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits.

56.     TRICARE prescription drug benefits are provided through three different programs: (i) military treatment facility outpatient pharmacies; (ii) TRICARE network retail pharmacies; and (iii) TRICARE's mail order service. TRICARE contracts with a PBM to administer its retail and mail order pharmacy programs. In-addition, TRICARE beneficiaries can also pay out-of-pocket to fill prescriptions at non-network retail pharmacies, and submit a claim for reimbursement directly with TRICARE's pharmacy benefits managers ("PBM"). The claims process is different for each of these pharmaceutical programs.

57.     When a TRICARE beneficiary brings a prescription to a TRICARE network retail pharmacy, for example, the pharmacy submits an electronic claim to the PBM for that prescription event. The PBM sends an electronic response to the pharmacy that confirms the beneficiary's TRICARE coverage, and, if the prescription claim is granted, informs the pharmacy of the calculated pharmacy reimbursement amount and the co-pay (if applicable) to be collected from the beneficiary. The pharmacy then collects the co-pay amount (if any) from the beneficiary and dispenses the medication. After a 10-day hold to ensure the prescription was picked up and not returned to the shelf by the pharmacy, the PBM sends a TRICARE Encounter Data ("TED") record electronically to TRICARE. The TED record includes information regarding the prescription event, including the reimbursement amount to be paid to the dispensing pharmacy. TRICARE then authorizes the PBM to make payment to the pharmacy for the amount remaining (after co-pay) on the claim. The PBM sends the payment to the pharmacy.

After the payment is made by the PBM's bank, the PBM's bank requests reimbursement from the Federal Reserve Bank ("FRB"). The FRB then transfers funds to the PBM's bank account.

58.     If the prescription is filled at a non-network retail pharmacy, the beneficiary must pay the full price of the prescription to the pharmacist and file a claim for reimbursement on DD Form 2642, TRICARE/DOD.CHAMPUS Medical Claim- Patient's Request for Medical Payment ("Form 2642"). The Form 2642 is mailed to the PBM. As in the case of reimbursements under the retail pharmacy program, a TED record is created and sent to TRICARE. TRICARE then authorizes payment to the TRICARE beneficiary. Upon receiving that authorization, the PBM issues a check to the beneficiary, which is drawn on the PBM's bank account. TRICARE then reimburses the PBM in the same manner as it does under the retail pharmacy program, such that funds are transferred from the FRB to the PBM's bank account.

59.     TRICARE beneficiaries can also fill prescriptions through TRICARE's mail order pharmacy program. TRICARE beneficiaries submit prescriptions by mail, fax, or electronically to TRICARE's PBM, along with any applicable co-pay. TRICARE's PBM delivers the prescription to the beneficiary via free standard shipping. The medications dispensed through the mail order pharmacy program are filled from the PBM's existing inventory of pharmaceuticals. The PBM then requests replenishment pharmaceuticals from DOD's national prime vendor contracted by Defense Logistics Agency ("DLA"). DOD procures the pharmaceuticals through its national prime vendor and replenishes the PBM's inventory of pharmaceuticals after accumulated dispensing reach full package size amounts. The PBM then submits a TED record to TRICARE to obtain administrative fees in connection with that prescription event. DLA bills TRICARE directly for drug replenishment costs.

60.     Pursuant to 38 U.S.C. § 8126, pharmaceutical manufacturers are required to enter

into national contracts with the DOD pursuant to which the manufacturer makes available for procurement certain covered drugs at the Federal Ceiling Price (a price that is calculated as at least 24% less than the manufacturer's average price based on all sales to commercial customers through a wholesaler or distributor). Pursuant to DOD's contract with its national prime vendor, the national prime vendor submits an invoice to the DOD for payment of pharmaceuticals supplied to the PBM in connection with the mail order pharmacy program, charging the DOD the price set by the contract awarded by the DOD to the drug manufacturer.

61.    Since March 2003, TRICARE has contracted with a pharmacy benefits manager, Express Scripts, Inc. ("ESI"), to administer TRICARE's mail order pharmacy programs. ESI has also administered TRICARE's retail pharmacy program since June 2004.

62.    Similarly, TRICARE's military treatment facilities purchase medications through procurement contracts with third party pharmaceutical prime vendors. When a TRICARE beneficiary submits an outpatient prescription to a military treatment facility's outpatient pharmacy, the pharmacy purchases the medication from the prime vendor pursuant to an existing procurement contract, and the drug is then dispensed to the patient.

63.    While some physicians enroll in the TRICARE program as network or· participating providers, any physician that is licensed, accredited and meets other standards of the medical community is authorized to provide services to TRICARE beneficiaries. Physicians who are enrolled in the TRICARE network must expressly certify their compliance with TRICARE's regulations. Yet all providers that provide services to TRICARE beneficiaries, whether network providers or non-participating providers, are required to comply with TRICARE's program requirements, including its anti-abuse provisions. 32 C.F.R.§ 199.9(a)(4).

64.    TRICARE regulations provide that claims submitted in violation of TRICARE's

anti-abuse provisions can be denied. *Id.* § 199.9(b). Kickback arrangements are included within the definition of abusive practices that constitute program fraud. *Id.* §§ 199.2(b), 199.9(c)(12).

### D.    Veterans Administration Health Care

65.    The Department of Veteran Affairs ("VA") maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs, are procured directly by the VA. A VA beneficiary can take a prescription to a VA medical facility, at which point the VA dispenses the medication to the VA beneficiary from its existing inventory. The VA also supports a mail service prescription program as part of its outpatient drug benefit. VA beneficiaries can submit prescriptions to that mail service program, and the VA then dispenses pharmaceuticals purchased by the VA directly to VA beneficiaries. The VA medical system serves approximately four million veterans.

66.    The VA purchases the pharmaceuticals that it dispenses at its medical facilities and through its mail service prescription program through its Federal Supply Schedule ("FSS") program. Pursuant to 38 U.S.C. § 8126, pharmaceutical manufacturers are required to enter into national contracts with the VA pursuant to which the manufacturer makes available for procurement certain covered drugs at the Federal Ceiling Price (a price that is calculated as 26% less than the manufacturer's average price based on all sales to commercial customers through a wholesaler or distributor). AVA facility that requires a supply of a particular medication (including a mail order facility) submits a purchase order to the VA's pharmaceutical prime vendor ("PPV") for distribution of pharmaceuticals.

67.    Since May 10, 2004, McKesson Corporation has served as the VA's PPV. The PPV fills the order for the facility, and then submits an invoice to the VA for payment, charging the VA the price set by the contract awarded by the VA to the drug manufacturer. The VA makes

payment to the PPV. The PPV then seeks a chargeback from the drug manufacturer for any difference between the contract price paid by the VA and the PPV's acquisition price.

68.     Pursuant to the PPACA, among other things, all claims to Government reimbursed programs resulting from a violation of the AKS are also a violation of the FCA.

69.     Moreover, the statutes and regulations set forth above concerning Medicare, Medicaid, TRICARE and Veterans Administration Health Care (collectively, the "Federal Healthcare Programs"), when viewed together, state that healthcare providers must not violate the AKS in order for claims they cause to be submitted to these programs to be reimbursed.

70.     The claims submitted here violated the AKS because they stemmed from prescriptions written by providers in exchange for bribes from the Drug Companies that knew that claims for reimbursement would be submitted by the physicians to the programs described above. Because the prescriptions were the result of the Drug Companies' illegal remuneration to the providers, those providers expressly and impliedly falsely certified compliance with the conditions of payment for the Federal Healthcare Programs.

71.     In addition to falsely certifying compliance with the AKS, the healthcare providers referred to herein also falsely certified compliance with the contractual provisions of those Programs that were also conditions for payment.

72.     As detailed herein, the Drug Companies devised and implemented schemes through which they (i) gave kickbacks to third party "educators" hired through the Consultants to induce those educators to recommend providers prescribe the Covered Drugs, and (ii) provided free in-kind services to providers to induce those providers to prescribe the Covered Drugs.

73.     Knowingly paying kickbacks to induce physicians to prescribe a drug on-label or off-label (or to influence physician prescriptions) for patients who seek reimbursement for the

drug from a Federal Government health program or causing others to do so, while certifying compliance with the AKS (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates the FCA and similar state False Claims Acts.

## DEFENDANTS' FRAUDULENT SCHEMES

74.    The following sets forth the illegal schemes that the Drug Companies and Consultants engaged in to increase the Drug Companies' sales for Rebif and profits at the Government's expense.

### D.    Quid Pro Quo 1—Free Reimbursement Experts for Referrals

75.    Serono induced providers to recommend its drugs by offering and providing what is referred to as "reimbursement support" services to those providers, including benefit verification services, patient prior authorization services and coverage appeals (collectively, "Support Services").

76.    Support Services are a great value to providers because these Support Services reduce, and in some instances, eliminate the administrative cost associated with prescribing drugs and increase profits for physicians and practices.

77.    Office-based providers derive significant portions of their revenue from 15, 30 and 45-minute units of services provided to patients during office visits.  The technical term for an office visit is "evaluation-and-management services" or "E/M" for short.

78.    In 2012, the most commonly billed Medicare physician service was the $70 "doctor office visit" for a 15-minute consultation, closely followed by the $100 "doctor office visit" for a 30-minute consultation.  Medicare pays over $11 billion each year from E/M services alone.  Medicaid and private insurers also pay billions each year.

79.    When an MS office-based provider receives payment for an E/M service from a

Federal healthcare program, part of the payment is intended to compensate the provider for medical care given *and* administrative tasks associated with that patient's care.

80.    For example, if a provider receives $50 for an E/M service, a portion of that $50 is intended to compensate the provider for the administrative tasks inherent in managing that patient's care.  These tasks include determining the patients' prescription drug insurance benefit verifications, determining if the drug is on the formulary lists and tiers, seeking a coverage determination, determining co-pays and deductibles and telephone calls to patients, responding to patient complaints, returning messages and faxes, handling prescription refill requests and, where necessary, obtaining prior authorizations, and handling the resulting paper trail.

81.    Despite the enormous administrative costs and expenses associated with Support Services, office-based providers are not permitted to directly charge patients a fee for any of these services pursuant to the payer-physician contract which pays for these services directly through the E/M unit charge.  Thus, office-based providers must use their own staff or outsource the work to a third-party for $50 to $80 per transaction.

82.    Because a MS provider's E/M reimbursement for each office visit is fixed per unit, providers are continuously seeking ways to combat and reduce overhead costs and expenses in order to earn more profit from each E/M unit billed. One way to reduce these costs is to lessen the administrative costs associated with prescribing MS drugs.  If a provider can reduce or eliminate this cost, each E/M unit will be more profitable, and their staff will have more time to devote elsewhere.

83.    Reducing the costs of prescribing MS drugs can be difficult, however, as the cost of many of the drugs is expensive (Rebif costs approximately $60,000 annually) and having adequate insurance vertifications and authorizations can be an arduous process.  This process

may involve multiple phone calls and hours of work to determine the nature and extent of patient insurance coverage.

84.     These economic forces have a direct impact on a providers' prescribing behavior. Providers are less likely to prescribe a drug that imposes an undue burden on support staff because this decreases profitability by requiring more staff or and reducing the number of patients that can be seen in a day. Conversely, a provider is much more likely to prescribe a drug if it can be prescribed with little or no administrative burden. Thus, the provider's relative cost and burden in prescribing one company's drug when compared to another company's drug can directly influence which drug a provider will recommend to a patient.

85.     With expensive MS drugs such as Rebif, the "hoops" a provider must jump through to obtain a prior authorization for coverage can be very time consuming for providers, and Serono was aware of this.

86.     To increase prescriptions for Rebif, Serono developed over the course of the last ten years a concierge of Rebif Support Services that are marketed to providers along with Rebif in order to increase the likelihood that providers choose to recommend Rebif.

87.     The Support Services included obtaining verifications and authorizations for Serrono drugs, as well as coverage appeals.  For example, each day, Serono's Rockland offices receives electronic and fax prescription requests from providers that are immediately forwarded to the vertification specialists who perform the verification process for the providers at no cost to the providers.  The verification specialist speaks directly to the primary and, as applicable, secondary insurance benefits, and verifies the nature and extent of coverage.

88.     The Support Services provided by Serono were comprehensive, and intended to provide a material advantage to the physicians choosing Rebif over competing drugs, some of

which required less paperwork to authorize with insurance companies or other payors.

89.     Offering the free Support Services was a way of compensating providers and inducing them to prescribe Rebif, and cost Serono millions of dollars.

90.     For the last half a decade, the Drugs Companies' sales representatives' ("Drug Reps.") pitch to providers in this regard has essentially been as follows:

> *Dear Doctor:  If you prescribe our drug (i.e., "recommend" the patient to use our drug), we will give you the services and resources of a full reimbursement support team to manage the process associated with prescribing the drug.  This service will save you the cost and expenses normally associated with managing a patient's prescription and make your practice more profitable.*

91.     This value proposition was a powerful tool in the hands of the Drug Companies' Drug Reps. and used to influence providers to recommend the Drug Companies' drugs.

92.     The Drug Reps. could offer a provider an "on call" reimbursement support team to manage patients' Serono drug prescriptions. Support Services became very much a part of the Serono Drug Reps.' collective sales pitch because it was a way of offering physicians increased profitability.

93.     Put simply, in exchange for prescribing Rebif, Serono would assume the providers' administrative responsibilities and costs associated with starting a patient on Rebif. The more a provider prescribed Rebif as a percentage of its overall prescription volume, the greater the savings and profits to the practice, as time and money spent on handling Support Services for Rebif would now fall exclusively on Serono.  These Support Services were the "carrot" or remuneration dangled to induce providers to prescribe Rebif to their MS patients. Providers could earn more if they prescribed Rebif.

94.     Rather than promoting and marketing its drugs on patient outcomes and efficacy, Serono introduced an additional incentive to providers to recommend its drugs to patients.

Serono knew that this service would present a tangible value to the providers. When that offer was accepted, the provider received the benefits of the Support Services without actually having to pay for those services.

95.    Most importantly, these services resulted in greater profit for providers prescribing Serono drugs because the "eliminate[d] an expense that [the provider] would have otherwise incurred"[1]. Such "in kind" remuneration given to induce a recommendation for a Serono drug is an unlawful kickback under the AKS.

96.    By giving a provider Support Services, Serono gave a tangile "in kind" benefit that greatly reduced an in some instances eliminated a provider's administrative costs related to prescribing Serono drugs and thus induced providers to choose Serono drugs over a competitor's drugs.

### A.    Overview of MS Care, DRUG COMPANY and ABC Corp

97.     In addition to providing Support Services to providers to help sell Rebif, the Drug Companies also contracted with Quintiles and RXC to provide the Drug Companies a force of Clinical Educators ("Nurse Educators") to work with Serono's sales people.

98.    Certified Nurse Educators, who are licensed practical and registered nurses employed by Quintiles and RXC, are recognized as specialty clinicians with particular training, education and experience in MS education and care.

99.    Nurse Educators are in particular demand for providers who care for MS patients, and many primary care and nuerology practices directly employ Nurse Educators to work with MS patients to educate them and their families about MS and its treatments. As clinicians with significant training, education and experience, Nurse Educators can command significant

---

[1] Compliance Program Guidance for Pharmaceutical Manufacturers, 68 F.R. 23,731 (May 5, 2003) ("CPG") Section II (2).

compensation in the healthcare workforce.

100.    Knowing that Nurse Educators were needed for most practices treating MS patients and aware that Nurse Educators were respected by physicians as clinicians (rather than sales representatives), the Drug Companies paid the Drug Consultants to unlawfully promote its drugs using Nurse Educators as will be detailed below.

**B.    Defendants' Unlawful "White Coat" Marketing with Nurse Educators**

101.    The Drug Companies knew that its potential prescribers (i.e., primary care physicians and neurologists) were frequently refusing to meet with its Drug Reps about the Drug Manufacturers' MS drug sales.

102.    The Drug Companies sought to overcome these barriers by using an unlawful marketing scheme through its relationship with the Consultants.

103.    In and/or around 2006, the Drug Companies entered into a relationship with the Consultants pursuant to which the Drug Companies would pay the Consultants in exchange for the Consultants deploying their Nurse Educators to gain access to providers to market the Drug Companies' drugs.

104.    The Drug Companies believed that, as expert clinicians, the Consultants' Nurse Educators were more likely than Drug Reps. to gain access to providers because they could talk on a "peer to peer" level with providers regarding MS.

105.    Nurse Educators were viewed by providers as more credentialed and thus more credible than the Drug Companies' Drug Reps.   The Drug Companies paid the Consultants tens of millions of dollars for the Nurse Educators force.

106.    Underscoring the Nurse Educators intended sales role, each of the Consultants' Nurse Educators underwent the Drug Companies' sales training programs, learned the Rebif

sales "pitch," and practiced sales techniques before going out to visit with providers. These programs were similar to those that were created for the Drug Reps, and lasted days.

107. During these trainings, the Nurse Educators would learn sales techniques, sales objectives and influence strategies.

108. Once trained, beginning in 2006, the Drug Companies started to deploy the Consultants' Nurse Educators across the country to call on MS providers who could prescribe the Drug Companies' products.

109. Because the Nurse Educators were clinicians and not intended to appear as Drug Reps., the Drug Companies needed a clever and nuanced approach to disguise this marketing strategy.

110. The Drug Companies knew that Nurse Educators could not openly appear to act in the role of drug reps for several reasons. One, the Drug Companies feared that if providers *knew* that the Nurse Educators were intended to be the Drug Companies' sales team, providers would limit Nurse Educator access in the same manner that providers had limited the access of Drug Reps. Two, of the Drug Companies openly admitted that Nurse Educators were promoting its drugs, the Drug Companies would be forced to lawfully restrict the Nurse Educators' messaging to only Food and Drug Administration ("FDA") -approved marketing materials or risk a charge of "off label" promotion. Lastly, the Drug Companies were aware that the OIG considers this "white coat" marketing (i.e., utilizing clinicians to promote and sell drugs) as particularly suspect.

111. As a result, the Drug Companies created a contrived disease awareness program that would cover the true role for the Nurse Educators, and make Nurse Educators appear to be functioning distinct and independent from the role of the Drug Reps.

112.    To accomplish this goal, the Drug Companies designated the Nurse Educators as as "educators" who, instead of selling drugs, were now marketing and promoting the free MS educational services to providers.

113.    Despite using a "form-over-substance" labeling of the Nurse Educators, the Nurse Educators were trained and deployed to function as Drug Reps. by every measure except title.

114.    The white coat marketing part of the strategy was hugely successful as the Drug Companies' gained the much-coveted "access" to providers and patients by using the Consultants' Nurse Educators.

115.    After gaining this access under the auspices of an education service, the Consultants' Nurse Educators ("white-coated" clinicians recognized as experts in MS treatments) were now in an ideal position to exclusively recommend Serono and Pfizer drugs to providers and, more troubling, directly to patients.

116.    The Drug Companies trained and directed the Consultants' Nurse Educators to directly promote Rebif to providers and patients once Nurse Educators gained access to and were in a position to recommend the Drug Companies' drugs to providers.

117.    In sum, the Drug Companies were paying the Consultants to use its Nurse Educators to influence providers to increase recommendations for an item paid for by the Federal Government. In doing so, the Drug Companies, as the payor, and the Consultants, as the payee, violated the AKS.

**C.    Quid Pro Quo Kickbacks — Free Clinicians for Referrals**

118.    In addition to the white-coat marketing scheme detailed above, the Drug Companies, in a separate but related more traditional kickback scheme, also sought to incentivize MS care providers to choose the Drug Companies' drugs over competitors' drugs.

119.    The Drug Companies identified the unique and particular needs and challenges that MS care providers faced in managing their own practices and patients. Once these providers' needs and challenges were identified, the Drug Companies, through the Consultants, began selling these providers "solutions" to those needs and challenges.

120.    One problem that providers treating MS patients faced was that MS patients were complex, and required multiple medicalations and extra training, time and resources to manage. Large provider practices specializing in MS care could afford to employ for "in-house" Nurse Educators to work with and manage MS patients.  Smaller providers, however, were much less likely to hire a Nurse Educator at a cost of $50,000 to $100,000 in annual salary or $40.00 per hour.    Without a Nurse Educator, the provder's office was strained to handle all of the complexities of managing a MS patient without being able to bill payors separately for those services.

121.    Consequently, starting in 2006, the Drug Companies began offering and then providing MS providers the time, service and expertise of a Consultant-employed Nurse Educator to help manage that providers' MS patients and to provide MS training to the providers' staff.   The Nurse Educators would assist with practice efficiency; train on MS care; teach patients how to perform injections; and be "on call" to answer patient questions.

122.     In some cases, the Nurse Educators would also provide one-on-one training for patients, during which the Nurse Educators could manage patients.

123.    All of these services would have been a cost to the provider if not for the Drug Companies providing the Nurse Educators to the providers free of charge.   Thus, the Drug Companies were materially decreasing the providers' cost of treating MS patients, and correspondingly increasing their profits.

124.   Of course, in typical quid pro quo fashion in order to be given these services those providers would have to "support" (i.e., write prescriptions for) the Drug Companies' MS drugs.

125.   Once trained and deployed, the Nurse Educators began to provide free education services to any provider who would prescribe the Drug Companies' products.  The Consultants' Nurse Educators were successful in saving prescribers' time, money and resources and, in many instances, resulted in receiving higher reimbursement rates associated with certain MS care metrics.  Not surprisingly, the Drug Companies also saw its drugs sales increase each time a Nurse Educator was deployed.

126.   By providing the Nurse Educator services to providers in exchange for Rebif prescriptions to be reimbursed by the Federal Healthcare Programs, the Defendants violated the AKS.

## DAMAGES

127.   As the Drug Companies and the Consultants profited from the illegal schemes described in this Complaint,, the Federal Healthcare Programs were made to bear the costs. From 2006 to the present, Defendants' purposeful and illegal marketing and *quid pro quo* arrangements have caused pharmacies, Part D sponsors, Fiscal intermediaries and others to submit millions of dollars in claims to the Federal Healthcare Programs for the Drug Companies' drugs.

128.   These claims were induced by illegal schemes and thus false claims. Consequently, the Federal Heathcare Programs have disbursed millions of dollars in reimbursements that should not have been paid.

**SUMMARY**

129.    As is detailed above, the Defendants are liable to the federal government for damages based on the payment of all claims submitted to Federal health care programs for prescriptions written for the Drug Companies' covered drugs beginning from the time they began paying remuneration as detailed above up and through the present because the claims were the result of recommendations induced, in whole or in part, by remuneration.

130.    Compliance with the AKS is a precondition of payment by virtue of federal and state statutes, regulations, provider agreements, and contracts.

131.    The certifications and attestations signed by physicians, pharmacies, PBMs and Part D sponsors certified compliance with the AKS. The kickbacks that were paid to and received by the Consultants and other health care professionals as detailed above to recommend the Drug Companies' drugs as alleged herein rendered those certifications and attestations false. Those false statements were material to the false claims submitted for the covered drugs.

132.    Claims for the Drug Companies' drugs arising from the kickbacks expressly and impliedly misrepresented compliance with a material condition of payment—compliance with the AKS. Claims that include items or services resulting from a violation of the AKS constitute false or fraudulent claims under the AKS. 42 U.S.C. § 1320a-7b(b).

133.    By providing remuneration to the Consultants and other health care professionals, the Drug Companies intended to induce those parties to recommend and/or prescribe the Drug Companies' drugs.

134.    It was reasonably foreseeable that some of those prescriptions would be for Federal Healthcare Programs' beneficiaries and that claims for those prescriptions would be

submitted to Federal Healthcare Programs.  In fact, thousands of such prescriptions or claims based on such prescriptions were submitted to and paid for by Federal Healthcare Programs.

## COUNTS
## FIRST COUNT – FCA

135.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

136.    Relators bring these claims on behalf of the United States, for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, against Defendants, for knowingly causing to be presented false claims to the Federal Healthcare Programs.  From on or about 2006 through the present, in this District and elsewhere throughout the United States, Defendants knowingly and willfully have violated the FCA by causing false claims tainted by illegal kickbacks to be submitted to the Federal Healthcare Programs.

137.    As a result of the Drug Companies' kickbacks paid to the Consultants and other health care professionals to recommend the Drug Companies' drugs in violation of the federal AKS, 42 U.S.C. § 1320a-7b(b)(2), false and fraudulent claims for payment based on these prescriptions were made to federal health care programs.

138.    Accordingly, Defendants knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(l) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

139.    By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

140.    Relators also bring this action under the False Claims Act, 31 U.S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B).

141.    As a result of the Drug Companies' kickbacks paid to violation of the federal AKS, 42 U.S.C. § 1320a-7b(h)(2), Defendants knowingly caused pharmacies, Part D sponsors, fiscal intermediaries and others to make false records or statements that were material to false or fraudulent claims for payment submitted to the Federal Healthcare Programs. Those false records or statements by physicians in turn caused the certifications and attestations signed by pharmacies, PBMs and Part D sponsors that certified compliance with the AKS to be false.

142.    By reason of these false records or statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

### SECOND COUNT
**California False Claims Act**
**Cal. Gov't Code §§ 12650 – 12655**

143.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code §§ 12650 – 12655.

144.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

145.    Defendants violated the California False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of California as described herein.

146.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of California.

147.    The State of California, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

148.     By reason of these payments, the State of California has been damaged, and continues to be damaged, in a substantial amount.

**THIRD COUNT**
**Colorado Medicaid False Claims Act**
**Col. Rev. Stat. §§ 25.5-4-303.5 – 25.5-4-309**

149.     This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5 – 25.5-4-309.

150.     Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

151.     Defendants violated the Colorado Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Colorado, as described herein.

152.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Colorado.

153.     The State of Colorado, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

154.     By reason of these payments, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount.

**FOURTH COUNT**
**Connecticut False Claims Act for Medical Assistance Programs**
**Conn. Gen. Stat. Ann. §§ 17b-301 *et seq*.**

155.     This is a claim for treble damages and civil penalties under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. Ann. §§ 17b-301 *et seq*.  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

156.     Defendants violated the Connecticut False Claims Act for Medical Assistance Programs by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Connecticut, as described herein.

157.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Connecticut.

158.     The State of Connecticut, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

159.     By reason of these payments, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount.

## FIFTH COUNT
### Delaware False Claims and Reporting Act
### 6 Del C §§ 1201(a)(1) and (2)

160.     This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del C §§ 1201(a)(1) and (2). Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

161.     Defendants violated the Delaware False Claims and Reporting Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Delaware, as described herein.

162.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Delaware.

163.     The State of Delaware, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

164.    By reason of these payments, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount.

## SIXTH COUNT
### District of Columbia Procurement Reform Amendment Act
### D.C. Code Ann. §§ 2-308.13 – 308.1526[2]

165.    This is a claim for treble damages and civil penalties under District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. §§ 2-308.13 – 308.1526.

166.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

167.    Defendants violated the District of Columbia Procurement Reform Amendment Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the District of Columbia, as described herein.

168.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the District of Columbia.

169.    The District of Columbia, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

170.    By reason of these payments, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount.

## SEVENTH COUNT
### Florida False Claims Act
### Fla. Stat. §§ 68.081 – 68.090

171.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081 – 68.090.

---

[2] Repealed effective April 8, 2011, and re-codified as D.C. Code Ann. § 2-381.01 *et seq*. without *qui tam* provisions.

172.     Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

173.     Defendants violated the Florida False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Florida as described herein.

174.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Florida.

175.     The State of Florida, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

176.     By reason of these payments, the State of Florida has been damaged, and continues to be damaged, in a substantial amount.

**EIGHTH COUNT**
**Georgia State False Medicaid Claims Act**
**Ga. Code §§ 49-4-168 *et seq.***

177.     This is a claim for treble damages and civil penalties under Georgia State False Medicaid Claims Act, Ga. Code §§ 49-4-168 *et seq.*

178.     Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

179.     Defendant violated the Georgia State False Medicaid Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Georgia, as described herein.

180.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Georgia.

181.    The State of Georgia, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

182.    By reason of these payments, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount.

## NINTH COUNT
### Hawaii False Claims Acts
### Haw. Rev. Stat. §§ 661-21 – 661-29

183.    This is a claim for treble damages and civil penalties under the Hawaii False Claims Acts, Haw. Rev. Stat. §§ 661-21 – 661-29.

184.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

185.    Defendants violated the Hawaii False Claims Acts by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Hawaii, as described herein.

186.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Hawaii.

187.    The State of Hawaii, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

188.    By reason of these payments, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount.

## TENTH COUNT
### Illinois False Claims Act
### 740 Ill. Comp. Stat. 175/1 *et seq.*

189.    This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*

190.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

191.    Defendants violated the Illinois False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Illinois, as described herein.

192.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Illinois.

193.    The State of Illinois, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

194.    By reason of these payments, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount.

## ELEVENTH COUNT
### Indiana False Claims and Whistleblowers Protection Act
### Ind. Code Ann. §§ 5-11-5.5-1 – 5-11-5.5-18

195.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblowers Protection Act, Ind. Code Ann. §§ 5-11-5.5-1 – 5-11-5.5-18.

196.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

197.    Defendants violated the Indiana False Claims and Whistleblowers Protection Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Indiana, as described herein.

198.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Indiana.

199.    The State of Indiana, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

200.    By reason of these payments, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount.

### TWELFTH COUNT
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. §§ 46:437 *et seq.***

201.    This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437 *et seq.*

202.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

203.    Defendants violated the Louisiana Medical Assistance Programs Integrity Law by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Louisiana, as described herein.

204.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Louisiana.

205.    The State of Louisiana, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

206.    By reason of these payments, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount.

## THIRTEENTH COUNT
### Maryland False Health Claims Act of 2010
### Md. Code Ann., Health-General §§ 2-601 *et seq.*

207.    This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-General §§ 2-601 *et seq.*

208.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

209.    Defendants violated the Maryland False Health Claims Act of 2010 by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Maryland, as described herein.

210.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Maryland.

211.    The State of Maryland, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

212.    By reason of these payments, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount.

## FOURTEENTH COUNT
### Massachusetts False Claims Law
### Mass. Gen. Laws Ann. Ch. 12 §§ 5A *et seq.*

213.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Law, Mass. Gen. Laws Ann. Ch. 12 §§ 5A *et seq*.

214.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

215.    Defendants violated the Massachusetts False Claims Law by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the Commonwealth of Massachusetts, as described herein.

216.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth of Massachusetts.

217.    The Commonwealth of Massachusetts, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

218.    By reason of these payments, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount.

### FIFTEENTH COUNT
### Michigan Medicaid False Claims Act
### Mich. Comp. Laws §§ 400.601 *et seq*.

219.    This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq*.

220.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

221.    Defendants violated the Michigan Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Michigan, as described herein.

222.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Michigan.

223.     The State of Michigan, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

224.     By reason of these payments, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount.

**SIXTEENTH COUNT**
**Minnesota False Claims Act**
**Minn. Stat. §§ 15C.01 *et seq*.**

225.     This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq*.

226.     Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

227.     Defendants violated the Minnesota False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Minnesota, as described herein.

228.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Minnesota.

229.     The State of Minnesota, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

230.     By reason of these payments, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount.

## SEVENTEENTH COUNT
### Montana False Claims Act
### Mont. Code Ann. §§ 17-8-401 – 17-8-412

231.     This is a claim for treble damages and civil penalties under Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 – 17-8-412.

232.     Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

233.     Defendants violated the Montana False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Montana, as described herein.

234.     As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Montana.

235.     The State of Montana, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

236.     By reason of these payments, the State of Montana has been damaged, and continues to be damaged, in a substantial amount.

## EIGHTEENTH COUNT
### Nevada Submission of False Claims to State or Local Government Act
### Nev. Rev. Stat. Ann. §§ 357.010 – 357.250

237.     This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. §§ 357.010 – 357.250.

238.     Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

239. Defendants violated the Nevada Submission of False Claims to State or Local Government Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Nevada, as described herein.

240. As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Nevada.

241. The State of Nevada, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

242. By reason of these payments, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount.

## NINETEENTH COUNT
### New Jersey False Claims Act
### N.J. Stat. §§ 2A:32C-1 *et seq*.

243. This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq*.

244. Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

245. Defendants violated the New Jersey False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of New Jersey, as described herein.

246. As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of New Jersey.

247.    The State of New Jersey, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

248.    By reason of these payments, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount.

## TWENTIETH COUNT
### New Mexico Fraud Against Taxpayers False Claims Act,
### N.M. Stat. Ann. §§ 44-9-1 *et seq*.

249.    This is a claim for treble damages and civil penalties under the New Mexico Fraud Against Taxpayers False Claims Act, N.M. Stat. Ann. §§ 44-9-1 *et seq*.

250.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

251.    Defendants violated the New Mexico Fraud Against Taxpayers False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of New Mexico, as described herein.

252.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of New Mexico.

253.    The State of New Mexico, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

254.    By reason of these payments, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount.

## TWENTY-FIRST COUNT
### New York False Claims Act
### N.Y. State Fin. Law §§ 187 *et seq*.

255.    This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law §§ 187 *et seq*.

256.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

257.    Defendants violated the New York False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of New York, as described herein.

258.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of New York.

259.    The State of New York, unaware of the false or fraudulent nature of these claims, paid such claims which it would not otherwise have paid.

260.    By reason of these payments, the State of New York has been damaged, and continues to be damaged, in a substantial amount.

## TWENTY-SECOND COUNT
### New York City False Claims Act
### Admin. Code §§ 7-801 *et seq.*

261.    This is a claim for treble damages and civil penalties under the New York City False Claims Act, Admin. Code §§ 7-801 *et seq.*

262.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

263.    Defendants violated the New York False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of New York City, as described herein.

264.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the City of New York.

265.    The City of New York, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

266.    By reason of these payments, the City of New York has been damaged, and continues to be damaged, in a substantial amount.

**TWENTY-THIRD COUNT**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-605 *et seq.***

267.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

268.    Defendants violated the North Carolina False Claims Ac by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of North Carolina, as described herein.

269.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of North Carolina.

270.    The State of North Carolina, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

271.    By reason of these payments, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount.

**TWENTY-FOURTH COUNT**

**Oklahoma Medicaid False Claims Act**
**Okl. Stat. Title 63 §§ 5053 *et seq*.**

272.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okl. Stat. Title 63 §§ 5053 *et seq*.

273.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

274.    Defendants violated the Oklahoma Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Oklahoma, as described herein.

275.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Oklahoma.

276.    The State of Oklahoma, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

277.    By reason of these payments, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount.

**TWENTY-FIFTH COUNT**
**Rhode Island State False Claims Act**
**R.I. Gen. Laws §§ 9-1.1-1 *et seq*.**

278.    This is a claim for treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq*.

279.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

280.    Defendants violated the Rhode Island State False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Rhode Island, as described herein.

281.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Rhode Island.

282.    The State of Rhode Island, unaware of the false or fraudulent nature of these claims, paid such claims which it would not otherwise have paid.

283.    By reason of these payments, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount.

**TWENTY-SIXTH COUNT**
**Tennessee False Claims Act**
**Tenn. Code Ann. §§ 4-18-101 *et seq*.**

284.    This is a claim for treble damages and civil penalties under the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et seq*.

285.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

286.    Defendants violated the Tennessee False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Tennessee, as described herein.

287.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Tennessee.

288.    The State of Tennessee, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

289.    By reason of these payments, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount.

## TWENTY-SEVENTH COUNT
### Tennessee Medicaid False Claims Act
### Tenn. Code. Ann. §§ 71-5-181 *et seq.*

290.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code. Ann. §§ 71-5-181 *et seq*.

291.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

292.    Defendants violated the Tennessee Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Tennessee, as described herein.

293.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Tennessee.

294.    The State of Tennessee, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

295.    By reason of these payments, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount.

## TWENTY-EIGHTH COUNT
### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. §§ 36.001 – 36.132

296.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 – 36.132.  Relators re-allege and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

297.    Defendants violated the Texas Medicaid Fraud Prevention Law by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Texas, as described herein.

298.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Texas.

299.    The State of Texas, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

300.    By reason of these payments, the State of Texas has been damaged, and continues to be damaged, in a substantial amount.

### TWENTY-NINTH COUNT
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. §§ 8.01-216.1 – 216.19**
301.

302.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 – 216.19.  Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

303.    Defendants violated the Virginia Fraud Against Taxpayers Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the Commonwealth of Virginia, as described herein.

304.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Commonwealth of Virginia.

305.    The Commonwealth of Virginia, unaware of the false or fraudulent nature of these claims, paid such claims, which it would not otherwise have paid.

306.    By reason of these payments, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount.

**THIRTIETH COUNT**
**Wisconsin False Claims for Medical Assistance Law**
**Wis. Stat. § 20.931**

307.    This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931.

308.    Relators re-allege and incorporate the allegations in the preceding paragraphs as if set forth fully herein.

309.    Defendants violated the Wisconsin False Claims for Medical Assistance Law, by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Wisconsin, as described herein.

310.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Wisconsin.

311.    The State of Wisconsin, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Wisconsin would not otherwise have paid.

312.    By reason of these payments, the State of Wisconsin has been damaged, and continues to be damaged, in a substantial amount.

**PRAYER FOR RELIEF**

WHEREFORE, Relators request that judgment be entered against Pfizer, Serono,

Quintiles and RXC follows:

(a) treble the United States' damages in an amount determined at trial, plus an $11,000

penalty for each false claim submitted in violation of the FCA;

(b) administrative civil penalties of $50,000 for each AKS violation, as well as an

assessment of not more than three times the amount of remuneration offered, paid,

solicited or received, without regard to whether a portion of that amount was offered,

paid or received for a lawful purpose;

(c) an award of costs, Relator's attorneys' fees in bringing this action and the maximum

Relators' award allowed pursuant to the FCA; and

(d) such further relief as is proper.


DATE :  April 25, 2017                    FLORIO PERRUCCI STEINHARDT & FADER


                                          By:___*Brian R. Tipton, Esq.*___
                                              Brian R. Tipton, Esquire
                                              Florio Perrucci Steinhardt & Fader, LLC
                                              235 Broubalow Way
                                              Phillipsburg, NJ 08865
                                              T: (908) 454-8300
                                              F: (908) 454-5827
                                              E: btipton@fpsflawfirm.com